359 So.2d 1355 (1978)
Frederick B. SCOTT
v.
STATE of Mississippi.
No. 50391.
Supreme Court of Mississippi.
May 17, 1978.
Rehearing Denied July 12, 1978.
*1357 David R. Hunt, Joe C. Webster, Clarksdale, for appellant.
A.F. Summer, Atty. Gen., by Billy L. Gore, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROBERTSON, P.J., and SUGG and WALKER, JJ.
*1356 SUGG, Justice, for the Court:
The defendant, Frederick B. Scott, was convicted in the Circuit Court of Coahoma County for the rape of a female above the age of twelve years, and was sentenced to life imprisonment.
The twenty-three year old prosecutrix arrived at her office at approximately 7:30 a.m. on February 18, 1976. While working near her reception desk which was located approximately ten feet from the office door, she heard the door bell ring and saw a young black male enter. The man entered, pulled a stocking over his face, and approached the victim with a small chrome pistol. The office was well lighted and she could see the man plainly before he pulled the stocking over his face. The man rummaged through the victim's purse, forced the victim to a work room located behind the reception room, and raped her. Three days later she identified the defendant from a photographic lineup as the rapist, and defendant's conviction was based principally on the victim's identification.
The defendant first assigns as error the court's refusal to sustain his motion to require the state to disclose the identity of a confidential informer. On February 21, 1976, three days following the rape, a confidential informer told Assistant Chief of Police Jimmy Carsley of the Clarksdale Police Department that the person who committed the robbery at the McWilliams Building was a man named Freddie. The informant stated that the person named Freddie, whose last name was unknown to him, had no visible means of support, was residing in an attic in an old house in Clarksdale, and had been arrested during the preceding week by the Clarksdale Police Department on burglary charges. After receiving the confidential informant's tip, Carsley searched his files for photographs taken during the preceding week. Included in the photographs was one of the defendant. It was shown to the victim together with photographs of several young black males. After reviewing the additional photographs, the victim identified defendant as the rapist.
The defendant contends that, because the tip from the confidential informant set a chain of events in motion which ultimately led to his identification and arrest, the disclosure of the informer's identity was necessary for a proper defense.
We find no error in the court's refusal to require the disclosure of the identity of the confidential informant. We have consistently held that, where the informer is not an actual participant or eyewitness to the alleged crime and is not a material witness to the guilt or innocence of the accused, the disclosure of the identity of the informer is within the sound discretion of the trial court. Sims v. State, 313 So.2d 27 (Miss. 1975); Ward v. State, 293 So.2d 419 (Miss. 1974); McCormick v. State, 279 So.2d 596 (Miss. 1973); and Young v. State, 245 So.2d 26 (Miss. 1971). Carsley testified that *1358 the confidential informant was reliable and had furnished correct information in the past. The confidential informant was not present during the commission of the robbery and rape; therefore, the trial court properly refused to require the state to disclose the identity of the informer.
The defendant next contends that the lower court erred in refusing to direct the prosecutrix to confer with his attorneys so she could be examined by his attorneys in a private conference. Three weeks before trial, counsel for the defendant filed a motion to require the prosecutrix to confer fully in a separate and private conference with them. They argued that their cross-examination of the prosecutrix at the preliminary hearing conducted earlier was impeded by objections of the district attorney which were sustained by the presiding justice court judge. The trial judge took the matter under advisement to avail himself of the opportunity to read the transcript of the preliminary hearing. After reviewing the transcript, the trial judge concluded that only one objection was improperly sustained at the preliminary hearing, and ordered the prosecutrix to meet privately with counsel for the defendant at the Coahoma County Courthouse for not more than ten minutes in order to permit them to ask that one question. The defendant argues, on appeal, that the failure of the court to permit a lengthy and searching interview of the prosecutrix by his counsel denied him the necessary means for a proper preparation of a defense.
For a long time we have recognized the right of a party to confer with witnesses in preparation for trial. As early as 1876 in White v. State, 52 Miss. 216, we held that it is not within the power of a judge to deny counsel for a defendant "conversation with his witness generally." This case also recognized that some interviews with witnesses should be allowed only in the presence of the sheriff or some officer of the court, but held that the court should never refuse counsel for defendant an opportunity to converse with a witness which he had subpoenaed and proposed to call. In Shaw v. State, 79 Miss. 21, 30 So. 42 (1901) the rule in White was reaffirmed as a denial of the constitutional right of a defendant; however, the right of a trial court to impose reasonable limitations as to the length of time of a conference was recognized.
In a number of cases we have upheld reasonable limitations on the right to confer with witnesses. Davis v. State, 218 So.2d 17 (Miss. 1969), cert. denied 395 U.S. 949, 89 S.Ct. 2032, 23 L.Ed.2d 469 (Miss. 1969); Cannon v. State, 190 So.2d 848 (Miss. 1966) (defense counsel was not permitted to interview prosecutrix and another witness except in the presence of an officer); Scott v. State, 218 Miss. 892, 56 So.2d 839 (1952) (time of conference limited by the court); Bruce v. State, 169 Miss. 355, 152 So. 490, suggestion of error overruled 169 Miss. 355, 153 So. 672 (1934) (time limitation imposed to avoid unreasonable delay of trial); Frazier v. State, 142 Miss. 456, 107 So. 674 (1926) (private conference with witness who was a convict denied because the witness was an escape risk); Mackie v. State, 138 Miss. 740, 103 So. 379 (1925) (defense counsel could not confer privately with witnesses who were children of tender years and who were afraid to confer privately except in the presence of another).
The essence of the right asserted by the defendant is that of access to prospective witnesses. A defendant's right to confer privately with witnesses should not be arbitrarily denied, provided the witness is willing to submit to questioning. The defendant's contention that the failure of the court to require a lengthy and searching examination of the prosecutrix denied him a fair trial is without merit because the record does not reflect either, that the prosecutrix was inaccessible for an interview before trial, or that she was willing to submit to an interview. The defendant had the opportunity to interrogate the prosecutrix at both the preliminary hearing and the suppression hearing. Hence, we are of *1359 the opinion that the trial court did not abuse its discretion by limiting the interview with the prosecutrix to ten minutes and one question.
In addition, the motion also presents the question of whether a trial judge may compel a witness to submit to an interview by counsel. This question has not been addressed by this Court, but other states hold that a trial judge may not compel a witness to submit to an interview unless the witness is willing to submit to the interview.
The rule in Massachusetts is that a witness may not be compelled to submit to an interview against his wish. In Commonwealth v. Carita, 356 Mass. 132, 249 N.E.2d 5 (1969) a witness was in custody and defense counsel desired to interview the witness. The Court outlined the procedure in such case as follows:
In practice, in such situations counsel for the defense should within an appropriate time file a motion to be allowed to interview the witness. The witness should thereafter be brought to court and instructed on his or her rights to consent or not to consent to an interview. A record should be kept of the proceedings. The answer of the witness will then determine whether an interview is to take place. If the answer is in the affirmative, a transcript of such interview may be taken in the discretion of the judge. See Commonwealth v. Doherty, 353 Mass. 197, 210-211, 229 N.E.2d 267. (356 Mass. at 142, 143, 249 N.E.2d at 11).
In Commonwealth v. Gibson, 357 Mass. 45, 255 N.E.2d 742, cert. denied 400 U.S. 837, 91 S.Ct. 75, 27 L.Ed.2d 70 (1970) information was solicited from two witnesses by defense counsel at which time the district attorney told them they did not have to talk with defense counsel unless they were willing. The Court stated:
We see nothing wrong here. The witnesses were not in protective custody (see Commonwealth v. Carita, 356 Mass. 132, 249 N.E.2d 5.) They were available for interview at other times and places subject to their willingness to be interviewed. Commonwealth v. McLaughlin, 352 Mass. 218, 224, 224 N.E.2d 444. (357 Mass. at 47, 255 N.E.2d at 743). (Emphasis Supplied).
In Commonwealth v. Pimental, 363 N.E.2d 1343 (Mass. 1977) the appeals court of Massachusetts held that it was not error to deny defendant's motion that he or his counsel be permitted to interview witnesses who would be called by the prosecution. The court noted that there was nothing to suggest that the prosecution had presented any obstacle to the defendant's interviewing the witnesses and allowance of the motion might have resulted in depriving the witnesses of their rights to refuse to be interviewed.
The rule in Illinois is stated in People v. Touhy, 361 Ill. 332, 197 N.E. 849 (1935) as follows:
In fact, we know of no rule which would authorize the court to compel a witness to be examined in private by counsel for either side of a case, especially in the absence of the consent of the witness, and it is not intimated that Costner was either desirous or willing to be interrogated out of the presence of the court. There was no error in permitting the witness to testify. People v. Scott, 261 Ill. 165, 103 N.E. 617. [361 Ill. at 349, 197 N.E. at 857, 858].
See also, People v. Clark, 9 Ill. App.3d 998, 293 N.E.2d 666 (1973).
In State v. Wallack, 193 Iowa 941, 188 N.W. 131 (1922) the Supreme Court of Iowa held:
A motion was made by counsel for defendant for an order requiring such witnesses to submit to a private interview with defendant's counsel, and the refusal to sustain such motion is alleged as error. Counsel cite no authority in support of their claim, nor do we believe such authority can be found. The court had no right, power, or authority to make such an order. He had no control over such *1360 witnesses, aside from their examination as witnesses in the regular manner and under the rules governing their examination as such. It was beyond the power of the court to require such witnesses to submit to any examination except in open court, and the overruling of such motion was proper and not error. [193 Iowa at 944, 188 N.W. at 133].
A defendant is entitled to access to prospective witnesses; however, this right exists coequally with the right of a witness to refuse to say anything. This the court failed to recognize. There is nothing in the record that suggests the prosecutrix was willing to answer questions of defense counsel. The prosecutrix was "directed to meet privately" with counsel for the defendant to answer a question that was improperly denied at the preliminary hearing. We can safely assume the witness would believe she would be bound to answer the question the same as if she was being questioned in court. The record does not indicate that the prosecutrix was advised that she did not have to submit to an interview unless she was willing. We hold that the trial judge did not have the authority to require the witness to submit to a private examination by defense counsel.
The defendant next contends that the failure of the state to produce tangible evidence denied him the right to a fair trial. On July 19, 1976, three weeks before trial, defendant filed a motion for discovery and inspection requesting the right to "examine, inspect, copy, photograph or make photostatic copies" of the items listed in footnote 1.[1]
No complaint is made that the state failed to comply with Items A through I of the motion. The state had in its possession articles of clothing of both the defendant and prosecutrix, samples of hair of both the defendant and prosecutrix, samples of fiber from the carpet where the crime took place and samples of matter from the defendant's clothing. Defendant contends that neither he nor the trial court could know whether these items may have been useful in his defense unless he had the opportunity to examine them before trial. It is noted that most of the items listed above were not introduced in evidence. This contention of defendant must be analyzed in the light of the rule announced by the United States Supreme Court controlling the duty of the state to submit tangible evidence to a defendant for examination and testing.
In United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) the Court addressed the issue of the duty of the state to furnish evidence to a defendant before trial and held that evidence which is clearly supportive of a claim of innocence must be disclosed even in the absence of a specific request. The Court stated:
In many cases, however, exculpatory information in the possession of the prosecutor may be unknown to defense counsel. In such a situation he may make no request at all, or possibly ask for `all *1361 Brady material' or for `anything exculpatory.' Such a request really gives the prosecutor no better notice than if no request is made. If there is a duty to respond to a general request of that kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor. But if the evidence is so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce, that duty should equally arise even if no request is made. Whether we focus on the desirability of a precise definition of the prosecutor's duty or on the potential harm to the defendant, we conclude that there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases, like the one we must now decide, in which there has been no request at all. [427 U.S. 106, 107, 96 S.Ct. 2399, 49 L.Ed.2d at 351, 352].
The Court further held that a prosecutor does not have a constitutional duty to routinely deliver his entire file to defense counsel, and established the standard of materiality as follows:
As the District Court recognized in this case, there are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request. For though the attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest that `justice shall be done.' He is the `servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.' Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314. This description of the prosecutor's duty illuminates the standard of materiality that governs his obligation to disclose exculpatory evidence.
On the one hand, the fact that such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial. For that reason the defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal. If the standard applied to the usual motion for a new trial based on newly discovered evidence were the same when the evidence was in the State's possession as when it was found in a neutral source, there would be no special significance to the prosecutor's obligation to serve the cause of justice.
On the other hand, since we have rejected the suggestion that the prosecutor has a constitutional duty routinely to deliver his entire file to defense counsel, we cannot consistently treat every nondisclosure as though it were error. It necessarily follows that the judge should not order a new trial every time he is unable to characterize a nondisclosure as harmless under the customary harmless-error standard. Under that standard when error is present in the record, the reviewing judge must set aside the verdict and judgment unless his `conviction is sure that the error did not influence the jury, or had but very slight effect.' Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557. Unless every nondisclosure is regarded as automatic error, the constitutional standard of materiality must impose a higher burden on the defendant.
The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable *1362 doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. [427 U.S. at 110-113, 96 S.Ct. at 2401-02, 49 L.Ed.2d at 353, 354, 355].
Items J and K of the defendant's motion for discovery constitute a general request within the meaning of the Agurs decision. The defendant contends, his examination of the tangible evidence, reports, tests, etc., might have disclosed exculpatory matter. In Agurs the Court stated, "the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish `materiality' in the constitutional sense."
Applying the Agurs test to the case at bar, we are of the opinion that constitutional error was not committed. The record does not reveal that any of the evidence withheld was exculpatory. Evidence which might be considered as exculpatory was disclosed to the defendant within a reasonable time before trial for the defendant's examination and study. This included an FBI laboratory report which was not furnished to either the prosecutor or the defendant until the day before the trial. This laboratory report contained test results of the clothing worn by the prosecutrix and the defendant. The report showed that fibers from the carpet where the crime took place and from the clothing of the victim were not found upon the clothing of the defendant. This exculpatory matter was submitted to the jury and defendant though his counsel was granted an interview with the FBI agent who testified about the laboratory analysis of the items he examined.
The defendant contends that had he been allowed an additional time to examine the tangible evidence such as the pistol, blood tests of defendant and the victim, carpet fibers, clothing worn by the defendant and the victim and the laboratory reports further exculpatory evidence might have been revealed. Many items such as the pistol, blood tests which showed the defendant and the victim had the same type blood, some articles of clothing of defendant and the victim and other items were not introduced in evidence by the state. This contention is without merit for two reasons. First, the fact that further examination might have revealed additional exculpatory evidence, is not sufficient under Agurs to give rise to a duty to require the prosecutor to disclose such matter upon a general request. Second and more significant, the trial court advised counsel for the defendant several times that the items did not appear on their face to contain exculpatory evidence, but if during the trial, it should develop that such items were exculpatory, reasonable time for examination and inspection was needed, the matter should at that time be brought to the Court's attention for consideration. Following these offers of the trial court the defendant did not make a request for further examination, neither did he demonstrate the exculpatory nature of the tangible items not introduced in evidence.
For these reasons, we are of the opinion that the defendant was not denied his constitutional right to disclosure of evidence that might be exculpatory in possession of the state.
The next assignment of error is that the trial court erred in allowing an in-court identification of the defendant by the prosecutrix. On the day that the rape occurred the prosecutrix was shown numerous photographs from the files of the Clarksdale Police Department. However, the prosecutrix did not identify her assailant from those photographs. Three days later the prosecutrix was shown more photographs that had not been placed in the mug books. Among these was a photograph of the defendant which was selected and identified by the prosecutrix as the assailant. Later that same day the prosecutrix was taken to the *1363 Clarksdale Police Department where she viewed the defendant through a one way mirror while he was in a room with a white male and a black female. This pretrial police station showup resulted in a second identification of the defendant by the prosecutrix.
The defendant claims that the in-court identification was the result of: (1) a highly suggestive photographic identification in which one or a very few number of photographs were used; (2) a highly suggestive police station showup in which the defendant was the only black male in the room; (3) knowledge by the prosecutrix that the defendant had taken and failed a lie detector test before the preliminary hearing in which she identified the defendant again; and (4) the extreme emotional distress of the victim who had been sedated at the time of her out-of-court identification. The defendant contends that the previous extrajudicial confrontations tainted the in-court identification which under the "totality of the circumstances," were so "impermissibly suggestive as to give rise to a real and substantial likelihood of irreparable misidentification." Further the defendant contends that the out-of-court confrontations were "critical stages" of the pretrial proceedings against the defendant and as such he should have been afforded advice and assistance of counsel.
First, the defendant's claim that the out-of-court confrontations violated his Sixth Amendment right to counsel is without merit because the right to counsel does not apply to pre-indictment lineups. Fells v. State, 345 So.2d 618 (Miss. 1977); Cox v. State, 326 So.2d 794 (Miss. 1976). Next, there is no factual basis in the record to support the defendant's contention that knowledge of the result of the lie detector test or the sedation of the prosecutrix in any way influenced the prosecutrix during the out-of-court identifications. Further, the contention of the defendant that the first photographic identification was suggestive because one or a very few photographs were used is without merit because both Assistant Chief and Police Jimmy Carsley and the prosecutrix testified that several photographs were used during this photographic lineup.
The ultimate issue presented is whether the pretrial photographic lineup and the police station showup were so highly suggestive and prejudicial that they corrupted any subsequent in-court identification. The photographs exhibited to the prosecutrix at the time of the first identification are not included in the record. Officer Carsley stated that he used four or five photographs consisting of black males from eighteen to twenty-five years of age, including that of the defendant, from which a positive identification of the defendant was made. Hence, we are of the opinion that the pretrial photographic lineup was not suggestive.
However, we are of the opinion that the pretrial police station showup, in which the defendant was the only black male present, was unnecessarily suggestive. We now address the issue of whether, under the totality of the circumstances, the suggestive showup was sufficient to give rise to a substantial likelihood of irreparable misidentification to warrant the suppression of the in-court identification by the prosecutrix.
In a recent decision we discussed the factors to be considered in determining whether under the "totality of circumstances" an in-court identification was reliable. The factors discussed in Fells v. State, 345 So.2d 618 (Miss. 1977) are applicable to the issue of whether an in-court identification is admissible following a suggestive out-of-court identification. In Fells, we quoted from Neil v. Biggers, infra, as follows:
When similarly confronted in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the United States Supreme Court said:
... It is, first of all, apparent that the primary evil to be avoided is `a *1364 very substantial likelihood of irreparable misidentification.' Simmons v. United States, 390 U.S. [377], at 384, 88 S.Ct. [967] at 971, [19 L.Ed.2d 1247]. While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of `irreparable' it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself. It is the likelihood of misidentification which violates a defendant's right to due process ... Suggestive confrontations ... increase the likelihood of misidentification... .
What is less clear from our cases is whether . .. unnecessary suggestiveness alone requires the exclusion of evidence... .
We turn, then, to the central question, whether under the `totality of circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime [Mrs. Johnson was face-to-face with the robber separated only by a counter in a well-lighted store], the witness' degree of attention, the accuracy of the witness' prior description of the criminal [Mrs. Johnson missed his true height by one inch and weight by five pounds; the description of his clothing was exact], the level of certainty demonstrated by the witness at the confrontation [Mrs. Johnson was `positive' and unwavering], and the length of time between the crime and confrontation [approximately thirty minutes]... . (409 U.S. at 198-199, 93 S.Ct. at 381-382, 34 L.Ed.2d at 410-411). [345 So.2d at 620, 621].
In Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Court was confronted with the same issue addressed in Neil v. Biggers, supra, that is, the effect of a suggestive out-of-court identification. Choosing to adopt the "totality of the circumstances" approach the Court discussed two approaches to this issue and stated:
Since the decision in Biggers, the courts of appeals appear to have developed at least two approaches to such evidence. See Pulaski, Neil v. Biggers: The Supreme Court Dismantles the Wade Trilogy's Due Process Protection, 26 Stan. L.Rev. 1097, 1111-1114 (1974). The first, or per se approach, employed by the Second Circuit in the present case, focuses on the procedures employed and requires exclusion of the out-of-court identification evidence, without regard to reliability, whenever it has been obtained through unnecessarily suggested confrontation procedures. The justifications advanced are the elimination of evidence of uncertain reliability, deterrence of the police and prosecutors, and the stated `fair assurance against the awful risks of misidentification.' 527 F.2d at 371. See Smith v. Coiner, 473 F.2d 877, 882 (CA4), cert. denied sub nom. Wallace v. Smith, 414 U.S. 1115, 94 S.Ct. 848, 38 L.Ed.2d 743 (1973).
The second, or more lenient, approach is one that continues to rely on the totality of the circumstances. It permits the admission of the confrontation evidence if, despite the suggestive aspect, the out-of-court identification possesses certain features of reliability. Its adherents feel that the per se approach is not mandated by the Due Process Clause of the Fourteenth Amendment. This second approach, in contrast to the other is ad hoc and serves to limit the societal costs imposed by a sanction that excludes relevant evidence from consideration and evaluation by the trier of fact. See United States ex rel. Kirby v. Sturges, 510 F.2d 397, 407-408 (CA7; opinion by Judge, now Mr. Justice Stevens), cert. denied, 421 U.S. 1016, 95 S.Ct. 2424, 44 *1365 L.Ed.2d 685 (1975); Stanley v. Cox, 486 F.2d 48 (CA4), cert. denied sub nom. Stanley v. Slayton, 416 U.S. 958, 94 S.Ct. 1975, 40 L.Ed.2d 309 (1973).
.....
The standard, after all, is that of fairness as required by the Due Process Clause of the Fourteenth Amendment. See United States v. Lovasco, 431 U.S. 783, 790, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977); Rochin v. California, 342 U.S. 165, 170-172, 72 S.Ct. 205, 208-209, 96 L.Ed. 183, 25 A.L.R.2d 1396 (1952). Stovall, with its reference to `the totality of the circumstances,' 388 U.S. at 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199, and Biggers, with its continuing stress on the same totality, 409 U.S., at 199, 93 S.Ct. 375, 34 L.Ed.2d 401, did not, singly or together, establish a strict exclusionary rule or new standard of due process. Judge Leventhal, although speaking pre-Biggers and of a pre-Wade situation, correctly has described Stovall as protecting an evidentiary interest and, at the same time, as recognizing the limited extent of that interest in our adversary system.
We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony for both pre- and post-Stovall confrontations. The factors to be considered are set out in Biggers, 409 U.S., at 199-200, 93 S.Ct., at 382, 34 L.Ed.2d 401. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. (432 U.S. at 110, 111, 113, 114, 97 S.Ct. at 2250, 2251, 2252, 2253, 53 L.Ed.2d at 151, 153, 154).
We apply the analysis to the facts in this case as follows:
1. The victim had the opportunity to view her assailant. She testified that as the assailant entered the office she looked directly at his face at a time when he was not wearing a mask. Later, during the commission of the rape itself, she testified that "he took the mask off and I happened to just open my eyes when he was fixing to pull it down, but I got another good look at him." During this second occasion the defendant was approximately one foot away from the victim.
2. This is not a case involving a casual or passing observer but instead the observance by the victim of the assailant involving a great deal of attention.
3. After the rape, the victim gave an accurate description of the assailant as follows: black male, medium height, slim build, clean shaven, medium hair, big nose, fat lips, spoke with a soft voice, had no body odor which she could recognize, wearing a blue jean jacket with designs on it. This description given by the victim before the photographic and police station identification is nearly identical to the biographical description of the defendant.
4. The victim displayed in both her out-of-court and in-court identifications a strong level of certainty. This is demonstrated by the fact that during the first photographic lineup when the defendant's photograph was not used, the victim did not make an identification. During the second photographic lineup when the defendant's photograph was used, the victim made a positive and unequivocal identification. The victim's in-court identification was equally unequivocal.
5. The time between the crime and the confrontations was three days. This lapse of time is not so remote as to impair the reliability of the out-of-court identification.
In viewing the facts enumerated above, the likelihood that the suggestive pretrial police station showup resulted in an irreparable misidentification is negligible. The trial court did not abuse its discretion in overruling the motion to suppress the in-court identification.
*1366 The defendant has assigned as error numerous other matters which are without merit and do not warrant discussion.
AFFIRMED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur.
NOTES
[1] A. The original print-out or read-out of the Polygraph Test administered to the Defendant, Frederick Scott, in Jackson, Mississippi on the 5th day of March, 1976, including the specific questions which were asked of the Defendant, Frederick Scott.

B. The original results of said Polygraph Test and/or the report from the technician who administered said Polygraph Test to the Defendant, Frederick Scott.
C. The name and address of the person who administered the Polygraph Test to the Defendant, Frederick Scott.
D. Any and all reports containing the statements and witnesses.
E. Copies of any and all oral statements made by any witnesses concerning the crime alleged herein.
F. The criminal record of any and all prosecuting witnesses.
G. The names and addresses of all witnesses to the alleged crime.
H. Any written or oral statement made by the Defendant herein.
I. To furnish the defendant's attorneys with the addresses at which subpoenas may be served on all prosecuting witnesses.
J. To furnish all evidence in possession of the State favorable to the accused.
K. To furnish such other and further information to this Court as may seem just and proper.