600 So.2d 199 (1992)
Ronnie Ray STRONG
v.
STATE of Mississippi.
No. 89-KA-0742.
Supreme Court of Mississippi.
May 20, 1992.
*200 Willie J. Perkins, Sr., Greenwood, for appellant.
Michael C. Moore, Atty. Gen., W. Glenn Watts, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and PRATHER and SULLIVAN, JJ.
SULLIVAN, Justice for the Court:
This ill fated marriage had its beginning and its end at the State Penitentiary at Parchman. Ronnie Ray Strong and Charlene Meeks met at the penitentiary in 1986 while Strong was an inmate, serving time for armed robbery, and Meeks was a guard. The two were married in April of 1988 and lived in Itta Bena, Mississippi.
From the very beginning the marital relationship was rocky and Strong believed that Charlene was seeing someone else within months of their marriage.
On the night of September 10, 1988, the suspicions erupted into violence and resulted in the death of Charlene Meeks and Ronnie Ray Strong's subsequent conviction for murder and sentence to life imprisonment in the custody of the Mississippi Department of Corrections.
Strong's version of the events of that fatal night are that he and Charlene left Itta Bena for Greenwood around 7:00 or 7:30 p.m. Johnny Pollard came by the house just as they were leaving but did not stay. Strong, Charlene, Robert Clayton, and the youngest of Charlene's children went to Greenwood, leaving Charlene's two older children with Tondolyn Meeks, Charlene's niece, at the house. After about an hour the group returned from Greenwood and Bessie Meeks, Tondolyn's mother, was at their home when they arrived.
Strong testified that when they came back from Greenwood, he stayed outside the house and Charlene went inside. The phone rang, Bessie Meeks answered it and was handing the phone to Charlene but Bessie hung it up when she saw Strong come into the house. Bessie and Charlene then went into the bathroom; Strong went back outside. When Strong returned to the house he saw Charlene leave the bathroom and head for the bedroom, but when Charlene saw him she went back to the *201 bathroom. When Strong passed the bathroom he saw Bessie put what he took to be a letter in her bosom.
Strong sat in the bedroom for a minute and then he went back outside and he and Robert Clayton went to the store. When Strong and Clayton returned from the store, Charlene's uncle had arrived at the house and Bessie Meeks was gone. Strong asked Charlene if she wanted him to take Tondolyn's friend home when he took her uncle home. Charlene said no, that she would take the friend home. Strong took Charlene's uncle home and when he returned Bessie Meeks was back sitting in the door. Charlene then asked for the car to take Tondolyn's friend home and pick up a hair dryer from her sister.
Strong claimed that Charlene said that she would only be gone ten or fifteen minutes but was in fact gone for an hour and a half. When Charlene and Tondolyn returned, Strong was sitting in the living room with Johnny Pollard and the children. Strong and Pollard had been drinking beer and when they went outside they smoked two joints. Strong told Pollard that he thought something was not right, meaning that Charlene had been out with another man, and asked to use Pollard's gun. Strong went to Pollard's car and got the .22 calibre pistol.
When Strong got the gun from Pollard's car, Charlene went in to take a shower. Strong thought that this was odd as she had taken a shower earlier before she left the house. Strong took Pollard's gun, which only had two (2) .22 calibre bullets in it, into the bedroom and put two (2) additional bullets into the chamber.
Charlene and Strong began arguing about where she had been and what she had been doing and this argument continued for some thirty to forty minutes. According to Strong at some point Charlene pulled brass knuckles from her purse and Strong pulled the pistol and they began "tussling." As they struggled the gun went off for the first time and Charlene fell back toward the couch. Strong fired three more times. After shooting Charlene, Strong ran from the house and claimed that he was in the process of turning himself in when he was arrested.
On cross-examination Strong stated that after Charlene was hit she fell back and grabbed her throat. She then tried to grab the gun again but she fell and rolled over on her back. Strong then shot her three more times.
The jury returned with a verdict of guilty as charged and the trial court sentenced Strong to life in the custody of the Mississippi Department of Corrections.

I.

WAS STRONG ENTITLED TO AN ACQUITTAL ON THE BASIS OF SELF-DEFENSE?

A. Directed Verdict and Peremptory Instruction
Strong argues that the trial court erred in not granting his motion for a directed verdict at the conclusion of the State's case, asserting that the State failed to meet its burden of proof, as it had not shown evidence of intent, premeditation, or malice aforethought. Strong further argues that the trial court erred in not granting Instructions D-1, and D-2, which are basically peremptory instructions, because there was no witness who contradicted his version of the shooting. He also contends that the trial court erroneously refused to grant instructions D-6, D-7, and D-10, which are self-defense instructions.
Our standard of review when considering a motion for a directed verdict and request for peremptory instructions requires that the prosecution's evidence be taken as true, together with all reasonable inferences that may be drawn from that evidence, and if the evidence is sufficient to support the guilty verdict, then the motions were properly overruled by the trial court. Lewis v. State, 573 So.2d 713, 714 (Miss. 1990).
Strong was indicted for murder under Miss. Code Ann. § 97-3-19(1), which provides:
(1) That the killing of a human being without the authority of law by any *202 means or in any manner shall be murder in the following cases:
(a) When done with deliberate design to effect the death of the person killed, or any human being;
* * * * * *
Miss. Code Ann. § 97-3-19(1)(a) (Supp. 1991).
"Deliberate design" to cause the death of a person is a necessary element of murder. In regard to "deliberate design," we have stated:
As defined by dictionaries the word "deliberate" always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. "Design" means to calculate, plan, contemplate. These are general and accepted meanings of these words.
While it is no doubt true that a deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent, it is a contradiction in terms to state that a "deliberate design" can be formed at the very moment of the fatal act. Moreover, it is possible for a deliberate design to exist and the slaying nevertheless be no greater than manslaughter. See Bangren v. State, 196 Miss. 887, 897, 17 So.2d 599, 600 (1944).
Windham v. State, 520 So.2d 123, 126 (Miss. 1988).
The evidence before the trial court was that Strong and Charlene were arguing over Charlene being gone so long. Johnny Pollard testified that Strong knew that he kept a gun in his car and that he discovered it missing after he left Strong's house. Tondolyn Meeks testified that she saw Strong go out to Johnny Pollard's car "get something and put it into his pants." Jim Clayton saw Strong pull the pistol on Charlene. Clayton and Tondolyn Meeks heard the first shot. Tondolyn heard another shot and then saw Strong stand over Charlene as she lay on the floor and fire two more times.
Chief of Police Banks testified that he found no weapons when he searched the area around Charlene's body and the kitchen area. Neither Tondolyn nor Jim Clayton testified to seeing any brass knuckles. Accepting this evidence and the reasonable inferences that flow from it in favor of the prosecution, it is clearly sufficient to support a guilty verdict. Strong got the gun from Pollard's car, put two more bullets in the chamber and took it with him when he talked to Charlene. He pulled the gun on her and stood over her after she was wounded and fired three more times. That is sufficient evidence for the jury to find deliberate design.
Strong cites Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933), but that argument is without merit as Strong was not the only eyewitness to the shooting. The Weathersby rule is inapplicable to the facts of this case. It was not error for the trial court to deny the motion for directed verdict and refuse the peremptory instructions.

B. The Self-Defense Instructions
Instructions D-6, D-7, and D-10 read as follows:
The Court instructs the Jury that the killing of a human being is no crime and is justifiable by law when done in necessary self-defense, real or apparent, and if you believe from the evidence that the defendant acted in real or apparent necessary self-defense in taking the life of the deceased, then in such event the defendant is neither guilty of murder or manslaughter and it is your sworn duty in such event to return a verdict of not guilty.
Instruction D-6.
The Court instructs the Jury that even though you believe from the evidence that the Defendant killed the deceased but that the deceased was killed when the Defendant reasonably believed from the behavior of the deceased that the deceased was then seeking to do him some great bodily harm, then the Defendant had a right to defend himself, even to the infliction of death, and the Jury must then return a verdict of not guilty.

*203 This is true even though the Jury should further believe from the evidence that the Defendant was not actually in danger of being done some great bodily harm by the deceased, provided he reasonably believed himself to be in danger of bodily harm at the hands of the deceased.
Instruction D-7.
The Court instructs the Jury that if the Jury believes from the evidence that the Defendant had reasonable grounds to believe, and did believe, that the deceased was about to inflict serious bodily harm upon the Defendant, then the Defendant had the right to resist deceased with such violence and weapons as were necessary to protect himself against such assault, even if resort was had to a deadly weapon; and Defendant under the law was not bound to flee, but might stand and resist so long as it was apparently necessary to prevent serious bodily harm to himself.
Instruction D-10.
The trial judge refused these instructions because he did not think that a self-defense instruction was appropriate as the evidence did not support such an instruction.
Strong responds that a defendant has an absolute right to have every lawful defense he asserts, even though based upon meager evidence, to be submitted as a factual issue to be determined by the jury under proper instructions of the court and that this Court will not allow a defendant to be denied his fundamental right. O'Bryant v. State, 530 So.2d 129, 133 (Miss. 1988). An instruction on the right to self-defense should not be excluded where the evidence indicates a violent situation and harm to the parties, but an instruction should not be given to a jury submitting a theory which is not supported by the evidence. Wadford v. State, 385 So.2d 951, 954 (Miss. 1980).
In regard to self-defense, we additionally stated in Wadford.
Self defense is a legal concept which must be supported by evidence to be available to a defendant in a homicide case. The mere statement by a defendant that he killed his victim in "self-defense" is wholly incapable by itself of raising a factual question requiring its submission to the jury. The plea of self-defense must be supported by evidence of facts and circumstances from which the jury may conclude that a defendant was justified in having committed the homicide because he was, or had reasonable grounds to believe that he was, in imminent danger of suffering death or great bodily harm at the hands of the person killed.
Wadford, 385 So.2d at 955.
Under the facts of this record, a self-defense instruction was not supported by the evidence, as Strong was not nor had he reasonable grounds to believe that he was in imminent danger of death or bodily harm from Charlene. Strong's simply claiming self-defense does not make it so. Refusing the instruction on self-defense was not error.

II.

WAS THE KILLING WITHOUT MALICE AND IN THE HEAT OF PASSION?

III.

WAS THE VERDICT OF THE JURY CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE?
These two assignments essentially assert that the murder verdict was contrary to the overwhelming weight of the evidence, which Strong contends indicates nothing more than manslaughter. Strong argues that there is no evidence of malice. He contends that he was under the influence of alcohol and drugs, and that he was provoked by Charlene's behavior under the circumstances. At trial the jury was clearly instructed as to both murder and manslaughter. The jury could have found Strong only guilty of manslaughter if they believed that there was sufficient provocation and the evidence did not support murder. However, the jury found that the evidence supported murder.
*204 To determine whether a jury verdict is against the overwhelming weight of the evidence, we view all of the evidence in the light consistent with the verdict and we give the State all favorable inferences which may be drawn from the evidence. Corley v. State, 584 So.2d 769, 773 (Miss. 1991). We will reverse only when we are convinced that the trial court has abused its discretion in failing to grant a new trial. Thornhill v. State, 561 So.2d 1025, 1030 (Miss. 1989), rehearing denied 563 So.2d 609 (Miss. 1990). The evidence in this case fully supports the verdict of the jury and is not of a nature to convince anyone that allowing the verdict to stand would be sanctioning an unconscionable injustice. The verdict of the jury is beyond the authority of this Court to disturb.
The conviction of Ronnie Ray Strong of murder and his sentence to life imprisonment in the custody of the Mississippi Department of Corrections is therefore affirmed.
CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, BANKS and McRAE, JJ., concur.
PITTMAN, J., not participating.